UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Blake R., | Case No. 0:17-cv-4273-KMM |
| Plaintiff, | |
| v. | ORDER |
| Nancy A. Berryhill, *Acting Commissioner of Social Security*, | |
| Defendant. | |

Blake R. challenges the Commissioner of the Social Security Administration's ("SSA") denial of his claim for disability benefits. Blake and the Commissioner have filed cross-motions for summary judgment. Pl.'s Mot., ECF No. 16; Def.'s Mot., ECF No. 20. Blake argues that the Commissioner's decision must be reversed a because it is not supported by substantial evidence. For the reasons stated below, Blake's motion is granted, the Commissioner's motion is denied, and this matter is remanded to the SSA for further proceedings.

I.  Background and Procedural History

Blake R. suffers from several severe mental-health impairments. These impairments include: Asperger's syndrome/Autism Spectrum Disorder; oppositional defiant disorder; attention deficit hyperactivity disorder ("ADHD"); depressive disorder not otherwise specified; and anxiety disorder. After fourth grade, Blake attended special education courses and had an individual education plan ("IEP") until he graduated from high school in 2014. Blake also required the one-on-one assistance of a paraeducator throughout the school day to ensure that he completed his work and avoided disrupting others. Throughout his time in school and in the months after he graduated, Blake struggled with maintaining personal hygiene and appropriate self-care. Blake alleges that he became unable to work as a result of his mental impairments on June 1, 2014, shortly after he turned 18 years old. Given his young age, Blake does not have a relevant work history.

1

When Blake applied for disability benefits in June of 2014, his claim was denied upon initial review. He sought reconsideration of that decision, and the SSA denied his claim again. Mr. R then requested a hearing before an Administrative Law Judge ("ALJ"), and on May 9, 2016, an ALJ conducted a hearing in Minneapolis. She heard testimony from Blake, Dr. Michael Lace (a medical expert who reviewed Blake's medical records), and William E. Villa (a vocational expert). Following the hearing, the ALJ denied Blake's claim, and he sought review from the Social Security Appeals Council. When the Appeals Council denied Blake's request for further consideration, the ALJ's decision became the final decision of the Commissioner subject to judicial review. 42 U.S.C. § 405(g). This lawsuit followed.

## II. Summary of the ALJ Decision

The ALJ followed the five-step sequential evaluation mandated by the SSA's regulations. 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ found that Blake has not engaged in substantial gainful activity since the alleged onset date of his disability and also concluded that he suffers from the severe mental impairments listed above. The ALJ next determined that Blake does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

As required by the regulations, the ALJ then determined Blake's residual functional capacity ("RFC"), a shorthand for the ALJ's determination of the most a claimant can do in a full-time job in light of all of his severe and non-severe impairments. The ALJ found that Blake has the following RFC:

> [Blake R.] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: routine, repetitive, 3-to-4 step work setting and defined as repetitive short-cycle type work as set forth in the Dictionary of Occupational Titles and its companion, very brief, very superficial, and very infrequent contact with coworkers, supervisors and the public further defined as tasks that would not require collaboration or teamwork with coworkers for performance and would not require direct interaction with the public for performance of the tasks, and in terms of tasks that would involve a lower than average pace, no high-speed pace, strict production rate pace or production quotas, and no work on an assembly line or in a

scenario such as needing to take immediate action either in response to what has been done before or what needs to be done next.

Admin. R. ("R") 17–18, ECF No. 11.

In concluding that Blake can work, the ALJ acknowledged evidence concerning Blake's issues with self-care and poor hygiene. She found that Blake "has some difficulty managing personal care and does not consistently shower, brush his teeth, or wash his hair." R. 15 (discussing activities of daily living at step two of the sequential evaluation). Further, the ALJ acknowledged that there are "numerous references" to Blake's struggles with poor hygiene, but found other records indicate that Blake "is able to maintain personal hygiene at times." R. 15. The ALJ noted that Blake testified he "cannot always feel when he has to go to the bathroom and will dirty his pants." R. 18. The ALJ also observed that issues with personal hygiene were present during his schooling and reflected in his IEP. R. 19. However, she found that Blake's problems with personal hygiene and care stemmed from a "motivational component." The ALJ based this conclusion on records showing that Blake played video games obsessively, R. 24, and other records indicating that "in late 2015 [Blake] reported showering at a more acceptable frequency and was not indicated to present with foul-smelling odor, with washing his face consistently as well," R. 25.

The ALJ also considered the evaluations of several mental-health professionals. One such assessment was provided by a psychologist, Amy Swingle, Psy.D, L.P., who interviewed Blake and his mother in October of 2015 following a referral from Blake's therapist. R. 25–27, 587–605. Based on the interview, her review of Blake's medical records, and an array of testing, Dr. Swingle provided several recommendations, including the following:

> 7) Blake should follow the following recommendations for ADHD in the home environment:
>    a. Organize materials and work space, have large projects broken down into smaller segments, and allow for breaks. Take regular breaks to refresh attention.
>    b. Work in a quiet distraction-free environment.
>    c. Use lists, reminder, and calendars.
>    d. Keep frequently used items in a consistent place.
>    e. Consider audio recording important information. Always ask permission before tape-recording others.

R. 603–04. After summarizing Dr. Swingle's findings and noting the above list of ADHD-related recommendations for the home environment, the ALJ stated that "Dr. Swingle did not include specific work-related restrictions in her conclusions, but the residual functional capacity [determination] accommodates the types of attention deficit hyperactivity disorder-related accommodations in the home indicated by her report." R. 27.

Ultimately, the ALJ determined that the RFC excerpted above was tailored to account for the functional restrictions resulting from his various mental-health symptoms and impairments, but she could not conclude that Blake was "completely unable to work as he alleges, due to significant inconsistencies in the records as a whole and lack of objective findings to support the degree of restriction [he] alleges...." R. 18–19. Based on the RFC finding and Blake's age, education, and work experience, the ALJ determined that there are jobs that exist in significant numbers in the national economy that he can perform, namely a "laundry worker" and "cleaner." R. 28–29. Therefore, she found that Blake was not under a disability as defined in the Social Security Act. R. 29–30. In this lawsuit, Blake challenges the ALJ's evaluation of his functional abilities as reflected in the RFC finding and the ALJ's analysis of Dr. Swingle's recommendations.

II.     Standard of Review

In a civil action challenging the Commissioner's denial of an application for disability benefits, the Court's review is deferential. A court should affirm an ALJ's decision if there is no legal error and it is supported by substantial evidence on the record as a whole. *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014). This standard is satisfied if the ALJ's finding are supported by evidence that would allow a reasonable person to reach the same determinations. *See id.* Courts should not reverse an ALJ's denial of benefits merely because they might have reached a different conclusion or because there is evidence that could support a different outcome. *Id.*; *see also Heino v. Astrue*, 578 F. 3d 922, 929 (8th Cir. 2009) ("If after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."). However, the inquiry required by the "substantial evidence on the record as

4

a whole" standard requires courts to consider not only the evidence that supports the ALJ's decision, but also the evidence that detracts from it. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) ("In undertaking this review, we do not merely examine the record for the existence of substantial evidence supporting the Commissioner's decision but also consider evidence that detracts from that decision.").

III. Discussion

Blake raises two issues in his motion for summary judgment. First, he argues that the ALJ erred in determining his RFC because she failed to discuss Blake's functioning in the context of a supportive living environment. Pl.'s Mem. at 4–13, ECF No. 17. Second, Blake contends that the ALJ was required to either accept Dr. Swingle's recommendations and include the restrictions she proposed in his RFC, or reject those proposed restrictions and explain the reasons for doing so; Blake asserts that she did neither. Pl.'s Mem. at 14–17. As explained below, the Court concludes that the ALJ erred both in assessing Blake's functional limitations without giving adequate consideration to the significant support he received and in attributing his issues with hygiene and self-care to personal volition, rather than his impairment. Because remand is required to reassess the RFC, the Court does not address Blake's second argument.

A. Structured Living Environment

Blake argues that the ALJ failed to account for the significant support he has received throughout his life when determining his RFC. *See* Pl.'s Mem. at 5 ("The record plainly demonstrates that Plaintiff's level of functioning has occurred in the context of a supportive environment and additional support."). Because such support is not available in the world of full-time, competitive employment, Blake essentially contends that the ALJ's RFC finding overestimates what he could reasonably be capable of doing in the workplace. *See id.* at 4–10. Specifically, Blake notes that he received special education with significant personal care services from a paraeducator while in school; had an IEP during his school years; has never lived on his own; and never managed his own finances. *Id.* at 5–6, 8–10. He also points out his difficulties with self-care and personal hygiene activities, including his failure to control the elimination of stool. *Id.* at 6–7. Further, Blake asserts that in April 2014, before he graduated high school, his IEP involved attending "Transitions Plus," a post-secondary special

education program that could help him meet the needs of employment and independent living; however, he dropped out of the program because of the stress he experienced. *Id.* at 7–8. Blake also notes that he received Adult Rehabilitative Mental Health Services ("ARHMS"), where he confirmed his need for help in finding a job, learning social skills, and fulfilling other goals of independent living. *Id.* at 8.

The ALJ's opinion acknowledges the circumstances Blake highlights. For example, she noted evidence indicating that: Blake has never worked; he received special education and personal care services while in school; he does not manage his own finances; he struggles with personal hygiene (including soiling his pants on multiple occasions); and he "struggles with independent living skills." R. 18, 19–20. With respect to Blake's struggles with personal hygiene, the ALJ found his diagnosis of encopresis is a non-severe impairment. R. 14. The ALJ's decision also notes an occasion on which Blake chose to continue playing a video game despite having a bowel movement in his pants. R. 23. And she referenced several records indicating that Blake presented with a foul-smelling odor at appointments with providers. R. 24. However, the ALJ found that "the overall evidence of record is not consistent with a 'marked' level of difficulty in [personal hygiene or social functioning]," because the evidence in the record provides support for both "little limitation and significant limitation" at various times. *See* R. 24. The ALJ further stated that Blake's "persistent gaming activities" contribute to his difficulties with personal hygiene and observed that he expressed no desire to address his gaming addiction. R. 25. As noted above, the ALJ found that Blake's issues with personal hygiene were the product of a lack of motivation. R. 24.

As the foregoing makes clear, the ALJ considered evidence bearing on the issue that Blake raises here, and the ALJ's written decision indicates a thorough examination of the record. Nevertheless, the Court concludes that the RFC determination is not supported by substantial evidence on the record as a whole. Two interrelated flaws, discussed below, convince the Court that the ALJ's RFC finding falls outside the available zone of choice. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice."). Remand is required.

### 1. Need for a Supportive Living Environment

First, the ALJ's RFC finding does not adequately reflect Blake's "need for a structured living environment" as required by SSR 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184 (July 2, 1996). This policy interpretation, which is binding on the SSA, contains a lengthy discussion of the way the Agency must determine an individual's RFC. In relevant part, SSR 96-8p provides that "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record, such as: ... [the] *need for a structured living environment*...." *Id.*, 1996 WL 374184, at *5 (first emphasis in original; second emphasis added). The ALJ cited SSR 96-8p in the "Applicable Law" section of the written decision, but the ALJ's opinion does not grapple directly with the requirement to consider whether Blake's records demonstrate a "need for a structured living environment." *See* R. 13, 17 (citing SSR 96-8p), R. 17–28.

Neither party directs the Court to caselaw analyzing SSR 96-8p's "need for a structured living environment" language, and the Court has found no authority directly on point. In *Nowling v. Colvin*, 813 F.3d 1110 (8th Cir. 2016), the Eighth Circuit found error in an ALJ's analysis that failed to consider the structured setting in which a claimant's previous functioning had occurred. Specifically, the court found that the ALJ erred by failing to consider "the effects of a structured setting as required by the regulations" in the context of the claimant's family's testimony regarding the support she required to engage in daily activities. *Id.* at 1122 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1200.F). The claimant's sister-in-law testified that she helped Ms. Nowling on a daily basis, that Ms. Nowling "refused to drive herself or appear in public, but managed self-care, housekeeping, and yard care on her own pace and participated in family events and other events when accompanied." *Id.* at 1117–18. Further, Ms. Nowling's sister-in-law described assistance that she and other family members would provide when Ms. Nowling suffered a seizure-like episode. *Id.* at 1118. The court also found that the ALJ improperly focused on a treating provider's notes indicating improvement in the claimant's condition "without acknowledging the unpredictable and sporadic nature of [her] symptoms [from several mental-health impairments], and without assessing the effect of her structured living environment." *Id.* at 1123 ("If your symptomology is controlled or attenuated by psychosocial factors, *we*

*must consider* your ability to function outside your highly structured settings") (citing § 1200.F).

Though the *Nowling* decision addresses unique issues that arise in somatoform disorder cases and does not analyze SSR 96-8p's "structured living environment" language, it certainly reinforces the regulation's requirement that the SSA must account for the structure and support a claimant receives when determining whether the individual is capable of working a full-time competitive job. Here, the ALJ's opinion notes that Blake "struggles with some independent living skills," but summarizes several of Blake's activities, and conclusively states that his "functional activities are consistent with the residual functional capacity." R. 19-20. The ALJ also observes:

> Notes indicated [Blake] knows how to do his own laundry (but does not do it), cleans around the house, and sometimes helps with grocery shopping as part of his chores. He also is able to make simple meals such as Ramen noodles and macaroni and cheese for himself, but would need some assistance using the stove or oven. Blake reporting having a savings account which his mother manages, and that he would likely live at home after high school because he would not be able to handle the stress of living independently. He reported he has made his own appointments a couple of times but does not usually do that. [Blake] reported not participating in community functions on a regular basis, but expressed interest in seeking a driver's license. He was aware of how to obtain a map on the internet if he needed to find directions. He reported attending a teen center and playing basketball in his spare time, and that he liked to do things alone as well as with others…. [Blake] planned to attend his school district's Transition-Plus program after completing high school…. These specific functional activities are consistent with the residual functional capacity.

R. 19-20.

The ALJ's discussion of Blake's "functional activities" fails to adequately explain how his limited functioning even within his very supportive home and school environments translates to the ability to perform full-time, competitive work. During his time in school, Blake's days were heavily structured and closely supported. Throughout the period covered by the record, Blake has lived at home where he obtained significant assistance from his mother in nearly all areas of daily living. Despite abundant support, Blake's records noted that he needs assistance and lacks the skills for independent living. Although aspects of the RFC finding reflect functional limitations supported by

the record, the ALJ's discussion does not confront how Blake could be expected to maintain even his reduced functioning reflected in his supportive school and home environments upon encountering the increased stressors of full-time, competitive work where no such support is present.

Many of Blake's records indicate that the reality of the substantial supports he has received throughout his life require a more restrictive RFC than that adopted by the ALJ, especially in light of Blake's ongoing issues with self-care and personal hygiene. For example, while he was in school and participating in small special-education courses, he nonetheless required the one-on-one assistance of a paraeducator for 360 minutes every day to ensure that he engaged in school work, was not disruptive to others, and completed assignments. *See* R. 329–40. A November 8, 2013 IEP notes that "[p]araeducator support is required throughout the day for intervention, prevention, and/or redirection of behavior that is or has the potential to be socially inappropriate or so disruptive that it interferes with others learning...." R. 335. It is difficult to imagine that a student who requires such an extraordinary amount of focused personal attention to make it through a school day in the already supportive environment of special education classes could work at a regular full-time job of any sort, absent similar significant support. Even the restrictive RFC adopted by the ALJ does not come close to the support he required to function in special education. And his need for support continued after his schooling was completed. Indeed, his mother was appointed as his legal guardian under a Minnesota law which, among other things, gives her the power to make significant decisions about Blake's living conditions and care and imposes the duty upon her to provide for his "care, comfort, and maintenance needs, including food, clothing, shelter, health care, social and recreational requirements, and, whenever appropriate, training, education, and habilitation or rehabilitation." R. 230; Minn. Stat. § 524.5-313(c).

Blake's issue with basic hygiene also demonstrate the degree of support he requires, and despite significant help his level of functioning is seriously impaired. Although Blake made some progress with personal hygiene at times, he was in frequent need of improvement on that goal, and it was also noted that Blake still needed assistance with his stooling schedule. R. 330. Even close to graduation, his lack of personal hygiene required the establishment of goals to ensure that he would comply

9

with staff directions to use the restroom to "freshen up" each time he had an accident, R. 418. In March 2014, an evaluation by the Fraser Autism Program explains that daily self-care tasks present a concern. R. 378–94. Blake did not consistently shower and would often not change clothing even after having an accident. R. 383. The ALJ's RFC finding does not fully account for the fact that Blake's limited functioning, including his acute self-care and personal hygiene concerns, occurred in the context of significant support from his school and his mother. *See Kennedy v. Comm'r of Soc. Sec.*, No. 6:17-cv-00988-HZ, 2018 WL 2724055, at *6 (D. Or. June 6, 2018) (reversing ALJ decision denying benefits to a plaintiff with Asperger's Syndrome and remanding for an award of benefits where the ALJ failed to acknowledge that the claimant obtained a college degree in the context of a both official and unofficial accommodations and the ALJ ignored several aspects of his limited functioning in a supportive home environment, including that "he does not bathe often, his parents need to remind him to comb his hair and to encourage him to do chores, and that his mother handles his checkbook").

At most, Blake exhibited sporadic and unsustained efforts at improving his self-care and personal hygiene, and close examination indicates that these areas remained significant problems for him throughout the relevant period. Prior to and shortly after graduating high school, in several visits with Dr. Chauhan, his pediatric psychiatrist, notes indicate that Blake had good or fair hygiene. *See* R. 442–44, 451–53, 458–60, 463–65, 482–84, 485–87, 488–90, 512–14, 515–17. However, subsequent treatment notes (after Blake was no longer receiving significant daily support in the school environment) show more significant struggles. Indeed, Dr. Chauhan appears alone among the care-providers reflected in the record in not noting Blake's poor hygiene, significant bad odor, and problems with self-care. *See, e.g.,* R. 518–22 (Dr. Selmo noting that Blake is "malodorous" and poorly groomed); R. 576, 580 (Dr. Babchuck noting that Blake's appearance is "disheveled"); R. 609–46 (Therapy progress notes identifying persistent foul smell and poor hygiene); R 680–81, 687–94, 705–06 (ARMHS notes indicating disheveled appearance, lack of showering). Though his therapist, Donald Resemius, observed Blake's poor hygiene and strong odor on a nearly weekly basis between June 2015 and April 2016 and repeatedly instructed him to engage in better personal hygiene, Blake exhibited no real improvement. R. 611–26, 629–40, 642–43. Mr. Resemius even considered discontinuing treatment if the problem did not improve. R. 613–14. In the same period, Blake also regularly met with ARHMS workers

who also attempted to get him to engage in better personal hygiene and self-care, setting goals for Blake to shower more regularly and wash his face several times between meetings. Occasionally, the ARMHS workers noted that Blake had completed his "homework" assignments of washing his face at least 3 times between weekly meetings. R. 684–85, 689–90. But the ARMHS records show that Blake continued to exhibit poor hygiene throughout 2015. R. 693–94, 695, 705–06, 714–17.

Overall, these records indicate that Blake's functional abilities are compromised to a significant degree even in the context of an ongoing support system. Agency policy requires consideration of a claimant's "need for a structured living environment" in determining the RFC. SSR 96-8p. "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule."). Unfortunately, here the ALJ's opinion does not adequately explain how Blake's structured living environment and the support he received were taken into consideration when determining that his already diminished functioning will not get significantly worse in an ordinary work environment. Remand is necessary for further consideration of this issue.[1]

---

[1] Though Blake did not explicitly raise the issue in this proceeding, the Court notes that in evaluating the "paragraph B" criteria of the relevant mental-health Listings at step 2 of the sequential analysis, the ALJ concluded that Blake has only "moderate" difficulties in activities of daily living. R. 15. The ALJ based this conclusion, in part, on Blake's ability "to maintain personal hygiene at times," relying on several therapy progress notes from Mr. Resemius and progress notes from his ARMHS worker. R. 15. However, these records reveal only sporadic or infrequent instances in which Blake reported showering or washing his face between sessions and they are stand in stark contrast to the numerous records showing ongoing issues in these areas. Indeed, one of the cited progress notes indicates that he continued to struggle with poor hygiene, R. 633, and another reveals that he "presented as not having showered in a few days," R. 687. And references to Blake's smell pervade the record. The ALJ's evaluation of Blake's daily activities as only moderately impaired appears to have relied

(*footnote cont...*)

## 2. "Motivational Component" for Poor Hygiene

The second flaw with the RFC finding is the absence of substantial evidence on the record as a whole to support the ALJ's conclusion that Blake's problems with personal hygiene and self-care are volitional. Citing records that indicate Blake expressed a lack of interest in making changes to his personal hygiene, resistance to intervention in his poor self-care, and an obsession with video games, the ALJ concluded that there was a "motivational component" to Blake's struggles in these areas. R. 24. This analysis, however, ignores substantial evidence suggesting that Blake's neglect of his own self-care and personal hygiene is a symptom of his mental impairments, rather than an indication that he made an unimpaired choice to engage in persistent gaming because he preferred that over cleanliness.

In a December 2013 re-evaluation for continuing special education services, when Blake was 17 years old, the report addressed his "present level of performance and educational needs that *derive from the disability*." R. 358 (emphasis added). Among the observations made in the evaluation was that "Blake needs help [with] personal cares such as brushing his teeth and directions with showering." R. 359. Practicing personal hygiene was noted as an area of weakness for his transition out of post-secondary school. R. 368.

A few months later, on March 25, 2014, the Fraser Autism Program prepared an evaluation based on a referral from Blake's probation officer. The evaluator noted that daily self-care activities are areas of difficulty for Blake and that he "does not consistently shower, brush his teeth, or wash his hair," fails to use the toilet consistently, and "will often not change even after he has been prompted to put on clean pants." R. 383. Administration of the Vineland Adaptive Behavior Scales test revealed that Blake's abilities fall in the low range for daily living skills, "indicating that he is unable to manage his daily living skills at a level that is appropriate for individuals his age" because of, *inter alia*, his struggles with personal hygiene and personal care. R. 386–87. The clinical summary also noted that Blake meets the criteria for Asperger's

---

on isolated records that do not constitute substantial evidence of an ability to function independently in a work setting.

disorder (a type of autism spectrum disorder) based in part on his "strong interest areas." R. 387. The evaluator noted that Blake's "diagnoses indicate that he will continue to need intervention services, as well as support to move towards independence, self-care and employment." R. 388. Further, the evaluation indicates that his "diagnosis of Asperger's Disorder indicates that Blake demonstrates a range of competent skills, yet has difficulty knowing how to use them within the context of a situation." R. 389.

Indeed, one of the criteria for a diagnosis of autism spectrum disorder is an individual's "restricted, repetitive patterns of behavior, interests, or activities," which may be manifested in, for example, "[h]ighly restricted, fixated interests that are abnormal in intensity or focus (e.g., strong attachment to or preoccupation with unusual objects, excessively circumscribed or perseverative interests)." Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") (5th ed. 2013). This feature of his Asperger's diagnosis—engaging in "repetitive or ritualistic behaviors that make a person appear different to their peers"—is also noted in the record. R. 359. This reinforces the observations noted above that Blake's protracted failure to engage in appropriate self-care and personal hygiene, while focusing his attention on playing video games instead, stems from a mental impairment.

These clinical observations indicate that Blake's struggles with personal hygiene and self-care are not the product of his own choice—i.e., he is not making an unimpaired selection between the option of obsessively playing video games over showering, cleaning himself after a bowel movement, or otherwise taking care of his own needs. Rather, the medical records show that his perseveration on gaming to the detriment of his own hygiene and self-care is a symptom of his mental impairments. Records suggesting that Blake is *capable* of taking better care of himself, but fixates on gaming for hours at a time, do not undermine, but rather reflect this feature of his mental-health condition. *See, e.g.,* R. 639–40, 645–46. Accordingly, the finding that his difficulties in these areas stem from a "motivational component" artificially attributes to personal choice those difficulties which are in fact the product of a potentially disabling combination of mental-health issues. *See Theabolt v. Colvin*, No. 3:12-cv-01627-SU, 2014 WL 50855 (D. Or. Jan. 6, 2014) (finding that an ALJ erred in concluding the claimant was not credible where his "motivation problems are a result of errors in

thinking driven by his mental impairments, i.e., Asperger's syndrome, anxiety and depression.... The medical record supports the conclusion that Theabolt's avolition results at least in part from his mental impairments"). As a result, the ALJ's reliance on a perceived lack of motivation in formulating the RFC is not supported by substantial evidence. Without this error, the RFC may well have been different, reflecting greater employment restrictions related to Blake's limitations in self-care and personal hygiene. Remand is required so that the ALJ can reevaluate Blake's RFC in light of the Court's conclusion.

### B. Inadequate Analysis of Dr. Swingle's Opinion

Because the Court has determined that remand is required so that the ALJ can reassess Blake's RFC consistent with the discussion above, it is unnecessary to reach Blake's argument that the ALJ failed to adequately evaluate Dr. Swingle's opinion. The Court leaves it to the SSA to determine, in the first instance, whether reevaluation of Dr. Swingle's recommendations is necessary in light of the Court's conclusions set forth above.

## IV. Conclusion

For the reasons stated above, Blake R.'s Motion for Summary Judgment **[ECF No. 16]** is **GRANTED** and the Commissioner's Motion for Summary Judgment **[ECF No. 20]** is **DENIED**. The Commissioner's conclusion denying Blake's application is **VACATED** and this case is **REMANDED** to the Social Security Administration for further administrative action consistent with the Court's decision pursuant to sentence four of 42 U.S.C. § 405(g).

**Let Judgment be entered accordingly.**

Date: March 15, 2019    *s/Katherine Menendez*
　　　　　　　　　　　　　　　　Katherine Menendez
　　　　　　　　　　　　　　　　United States Magistrate Judge